IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LOUISE M. SHEBOY, ) | CASE NO. 1:11CV2241 |
| ) | |
| Plaintiff, ) | JUDGE JAMES S. GWIN |
| ) | |
| v. ) | MAGISTRATE JUDGE |
| ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | **REPORT AND RECOMMENDATION** |
| Defendant. ) | |

Plaintiff Louise M. Sheboy ("Plaintiff" or "Sheboy") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act), 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).  For the following reasons, the final decision of the Commissioner should be **AFFIRMED.**

## I.  Procedural History

On March 3, 2009, Sheboy filed applications for SSI and DIB, alleging a disability onset date of February 23, 2009.  Tr. 124-127, 128-131.  Sheboy claimed that she was disabled due to a combination of impairments, including glaucoma, vision problems, depression, and shingles, Tr. 60-66, 67-74.  The state agency denied Sheboy's claims initially and upon reconsideration, and Sheboy timely requested a hearing before an administrative law judge.  Tr. 56-66, 69-74, 81-88.  On March 3, 2011, a hearing was held before Administrative Law Judge Julia A. Terry (the "ALJ").  Tr. 31-55.  On March 15, 2011, the ALJ issued a decision finding that Sheboy was not

disabled.  Tr. 13-30.  Sheboy requested review of the ALJ's decision by the Appeals Council on March 22, 2011.  Tr. 10-12.  On August 23, 2011, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II.  Evidence

### A.  Background

Sheboy was born on September 7, 1958, and was 52 years old at the time of the administrative hearing.  Tr. 34.   She graduated high school and completed some vocational training.  Tr. 34.   Sheboy has past work experience as a veterinary technician and bartender.  Tr. 51.  In July 2010, she began a part-time job stocking shelves at Michael's craft store.  Tr. 34.  She testified that she worked at that job two days a week for three or four hours per day.  Tr. 34.

### B.  Medical Evidence

#### 1.  Treatment History

Sheboy has a history of treatment for problems with her eyes, left hip pain, and depression from providers at MetroHealth Medical Center ("MetroHealth").  Tr. 262-65, 271-76, 291-418, 427-73, 477-770.[1]  She was referred to MetroHealth's eye department in February 2009, and diagnosed with glaucoma.  Tr. 262-65, 368-71, 537.  During monthly follow-up appointments in March, April and June of 2009, Sheboy reported some improvement and some headaches.  Tr. 350-54, 358-67, 386-95, 519-23, 528-37, 541.  In June 2009, she reported that her right eye felt great.  Tr. 396-99.

On May 12, 2009, Sheboy reported to MetroHealth and complained of left hip pain and a rash.  Tr. 271-76.  She was diagnosed with neuritis/shingles and was treated with medication.  Tr. 272.  At follow-up visits over the next few months, Sheboy reported that the rash and pain had resolved.  Tr. 274-76, 322-24, 355-57, 490-92, 523-27.

---

[1] The transcript contains many duplicated records.

On July 8, 2009, Sheboy was seen for a psychiatric assessment at MetroHealth due to complaints of depression because of her vision problems, being fired from her job, and pain from shingles.  Tr. 344-49, 509-15.  She reported no past history of psychiatric treatment.  Tr. 344.  Sheboy stated that she had been depressed, irritable, and mean, and had driven away all of her friends.  Tr. 344.  She also explained that she had a history of drug use and continued to use drugs, specifically marijuana and alcohol.  Tr. 344-45.  On exam, Sheboy was alert, oriented, had logical thought, fair insight and judgment, sustained concentration and attention and a depressed mood.  Tr. 347-48.  She was diagnosed with major depression, single episode, and assigned a Global Assessment of Functioning score ("GAF") of 41-50.[2]  Tr. 348.  During subsequent sessions, Sheboy reported that she was feeling better, that she was self-medicating with alcohol and marijuana, and that she was performing her daily activities better.  Tr. 331-33, 338-43, 497-99, 503-09.

At counseling sessions at MetroHealth in August and September 2009, Sheboy reported that she was getting along better and that she could accept her situation.  Tr. 306-08.  She reported that she had anxiety regarding her upcoming eye surgery and her vision.  Tr. 306-08, 312-14, 319-21.  She stated that Zoloft helped her anxiety.  Tr. 306.  She also stated that she had stopped taking some of her medications.  325-30.

Due to limited success with eye treatment (Tr. 309-11, 315-18, 334-37, 477-78, 481-85, 499-502), Sheboy had a trabeculectomy to the right eye on October 5, 2009.  Tr. 408-13, 710-15.  The surgery was performed by Raymond R. Lancione, M.D., at MetroHealth.  Tr. 408.

---

[2] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

Following surgery, Sheboy reported less eye irritation and pain and that a subsequent leak resolved. Tr. 291-305, 677-79, 682-87, 694-710. On December 14, 2009, Sheboy had a trabeculectomy to the left eye. Tr. 669-77. After this surgery, Sheboy reported a slight improvement of vision. Tr. 603-06, 609-21, 646-68.

At a counseling session at MetroHealth in November 13, 2009, Sheboy reported that the leaks in her eyes had resolved and that she had permission to resume activity, walk her dogs, and exercise. Tr. 688-90. She noted that she missed driving and that she was still uneasy in the dark. Tr. 688. She also stated that shopping took longer because she would lose focus. Tr. 388.

Sheboy began treating with Tatjana Drahotusky-Dodig, M.D., for her mental health issues in November 2009. Tr. 375-79, 452-55. At her initial appointment, she reported that she feared losing her vision, that she engaged in regular marijuana use, and that she cared for 6 pets. Tr. 690-94. On examination, Sheboy was alert and oriented with logical thought, fair insight and judgment, and sustained memory and attention. Tr. 692. Dr. Drahotusky-Dodig diagnosed Sheboy with mood disorder, NOS, and assigned Sheboy a GAF score of 51-60.[3] Tr. 692. Sheboy saw Dr. Drahotusky-Dodig again on December 29, 2009, and complained of diminished vision, which caused difficulty with daily activities, as well as headaches and eye pain from her surgery. Tr. 656-57.

On February 8, 2010, Dr. Lancione performed a trabeculectomy revision to Sheboy's left eye. Tr. 383, 400, 416. In a report prepared by Dr. Lancione for the state agency on February 9, 2010, he noted that Sheboy had best corrected 20/40 visual acuity in both eyes. Tr. 383-85. He also noted that, due to the extent of peripheral vision loss, Sheboy would have difficulty performing work related activities such as reading, working at heights, or working in hazardous

---

[3] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* DSM-IV-TR, at 34.

4

situations. Tr. 385. In follow-up visits in February and March 2010, it was noted that Sheboy was doing well after her revision surgery. Tr. 427-50, 618-21, 624-39.

During counseling sessions in March and April 2010 at MetroHealth, Sheboy reported being more comfortable and positive about her eyes. Tr. 607-08, 621-23. She reported that she was still nervous in social settings and still had some difficulty with daily activities. Tr. 607-08, 621-23. In a counseling session on May 12, 2010, Sheboy reported planting tomatoes and strawberries and having a fighting spirit. Tr. 716-17. At counseling sessions in June and July 2010, Sheboy stated that she wanted to get out of her funk and adjust to her contacts and vision distortion. Tr. 726-28. She stated that she relaxed by swimming. Tr. 726. She also noted that she walked her dogs and was feeling more comfortable. Tr. 726-.

Sheboy saw Dr. Drahotusky-Dodig on May 18, 2010. Tr. 719-21. Dr. Drahotusky-Dodig noted that, after four months, Zoloft was working fine and that Sheboy was stable. Tr. 719-21. Sheboy had a follow-up with Dr. Drahotusky-Dodig on July 12, 2010. Tr. 743-44. She reported that her mood had improved and that her vision was almost back to baseline. Tr. 743. She also noted that she was more functional and able to work in her back yard. Tr. 743. At a therapy session with Dr. Drahotusky-Dodig on September 15, 2010, Sheboy reported that she had two part-time jobs with no supervision and lots of flexibility. Tr. 754-56. She also stated that she did not take her Zoloft regularly but, when she did, she felt better. Tr. 754. And, at a session with Dr. Drahotusky-Dodig on December 10, 2010, Sheboy reported that she took Zoloft in divided doses and stopped taking Klonopin. Tr. 768-70.

On March 1, 2011, Dr. Drahotusky-Dodig completed a Mental Residual Functional Capacity questionnaire for Sheboy. Tr. 771-75. She found that Sheboy had major depressive disorder with a history of alcohol dependence in remission and a GAF score of 50-60. Tr. 771.

She noted that Sheboy's treatment included therapy and medication and that Sheboy responded well to treatment. Tr. 771. With regard to mental abilities and aptitudes needed to do unskilled work, Dr. Drahotusky-Dodig opined that Sheboy's irritability and anxiety would preclude her from meeting the competitive standards in the following four categories: (1) maintain attention for two hour segments; (2) perform at a consistent pace without an unreasonable number and length of rest periods; (3) accept instruction and respond appropriately to supervisors; and (4) get along with coworkers or peers without unduly distracting them or exhibiting behavior extremes. Tr. 773-74. She also opined that Sheboy could be absent about four days per month. Tr. 775. Dr. Drahotusky-Dodig stated that Sheboy's alcohol and substance abuse did not contribute to any of her limitations. Tr. 775.

    **2.**    **State Agency Physicians**

On May 5, 2009, Sheboy reported to state agency consultative examiner Harvey Lester, M.D., for an ophthalmological examination. Tr. 267-70. Dr. Lester found that Sheboy's best corrected vision was 20/40 in her right eye and 20/30 in her left eye, and that she had only a slight concentric constriction of the visual field. Tr. 267-68. He diagnosed Sheboy with chronic simple glaucoma and early cataracts. Tr. 268. Dr. Lester then opined that Sheboy would have no problem with work related activities. Tr. 269.

On December 8, 2009, Karen Steiger, Ph.D., a state agency medical consultant, reviewed Sheboy's medical records and completed a psychiatric review technique (PRTF). Tr. 277-90. She opined that Sheboy's major depressive disorder, single episode, did not meet a Listed Impairment, and that she had no limitations as a result of her mental impairment. Tr. 277-90. Dr. Steiger noted that Sheboy's treatment notes indicated that she had sustained

attention/concentration, logical and organized thought processes, as well as normal recent and remote memory.  Tr. 289.

On March 2, 2010, Teresita Cruz, M.D., a state agency physician, reviewed Sheboy's medical records and completed a Physical Residual Functional Capacity ("RFC") form.  Tr. 419-426.  Dr. Cruz found that Sheboy had no exertional limitations, except that she could never climb ladders, ropes and scaffolds, and that she needed to avoid all exposure to hazards such as working at heights or with dangerous materials.  Tr. 420-23.  Dr. Cruz considered Sheboy's allegations regarding her vision credible, but found that her claim that she could not walk due to left leg pain were not supported by the medical evidence, which indicated that the pain was improving.  Tr. 424.

## C. Administrative Hearing

### 1. Sheboy's Testimony

On March 3, 2011, Sheboy appeared with counsel and testified at a hearing before the ALJ.  Tr. 31-49.  In opening statements, Sheboy's counsel explained that Sheboy suffered from physical and mental impairments that interfered with her ability to work, including glaucoma, cataracts, lattice degeneration and myopia, headaches, degenerative disc disease, obesity, and depression.  Tr. 34-37.  Sheboy then testified about her vision problems and stated that she could not see very clearly or read small print and that she did not drive because of her poor vision.  Tr. 37-38.  However, she testified that she had recently passed a driving test, including the vision portion of the test.  Tr. 37-38.  She also testified that she had back pain, but stated that she was not currently receiving any treatment for her back pain.  Tr. 50.  She stated that she took Zoloft for her depression and Vistaril for anxiety.  Tr. 46.  Sheboy further testified that she drank wine with every meal, even though it did not interact well with her medication, and used marijuana

about once a week. Tr. 49-50.

Sheboy stated that she lived alone. Tr. 39-40. She testified that she could prepare simple meals using the microwave and that she did all of her grocery shopping. Tr. 40. She also explained that, while she did not like to interact with people, she would ask for help or rides from friends when needed. Tr. 40-41. In a report to the state agency, Sheboy stated that she took care of her pets (six dogs and cats), managed her own household without assistance, prepared simple meals, shopped, paid bills, watched television, listened to music and worked outside the home at least two days a week, and had a few friends. Tr. 232-236, 378.

### 2. Vocational Expert's Testimony

Robin Cook appeared at the hearing and testified as a vocational expert (the "VE"). Tr. 50-54. The VE stated that Sheboy had previously worked as a veterinary technician, which was skilled work at a medium exertional level, and a bartender, which was semi-skilled work at a light exertional level. Tr. 51. The ALJ then asked the VE whether a hypothetical individual with Sheboy's vocational characteristics and the following limitations could perform any work in the national economy:

> [L]imited to light exertional work. Lifting and carrying 20 pounds occasionally, 10 pounds frequently. Can stand and walk six out of eight hours, and sit for six out of eight hours. Do all postural activities at least occasionally. No climbing of ladders, ropes or scaffolds. She has limited visual acuity and limited field – peripheral vision. As best corrected, the vision of 20/40 on the right, and 20/30 on the left. And she should not be required to perform work that requires fine or excellent visual acuity. She would have difficulty reading small print. And she should avoid all work hazards, such as machinery and unprotected heights. And she should avoid jobs that require more than superficial interaction with others.

Tr. 52-53. The VE testified that the individual could perform work that existed in significant numbers in the national economy, including the following jobs: housekeeping/cleaner (7,585 jobs in Ohio and 454,615 jobs nationally), machine operator/folding machine operator (1,409

8

jobs in Ohio and 129,180 jobs nationally), and duplicating machine operator (580 jobs in Ohio and 79,470 jobs nationally). Tr. 53. The VE stated that none of these jobs would require reading of small print. Tr. 53. In a second hypothetical, the ALJ added the following restrictions:

> [S]he has difficulty with severe mood swings and depressed mood, that she isolates from others. She has had difficulty getting along with coworkers as well as – the public. That she requires naps during the day, that she's had – thoughts, crying spells . . . does not interact with coworkers. Does not – customers. That she has diarrhea five to six times a day. Can sit for about 30 minutes at a time. She does not drive. And she has daily headaches as well as back problems.

Tr. 54. The VE responded that the hypothetical individual, with these additional limitations, could not perform any jobs that exist in significant numbers in the national economy. Tr. 54.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2). In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

At Step One of the sequential analysis, the ALJ found that Sheboy had not engaged in substantial gainful activity since February 23, 2009, the alleged onset date.  Tr. 18.  At Step Two, the ALJ determined that Sheboy had the following severe impairments: obesity, glaucoma, cataracts, lattice degeneration and myopia in both eyes, degenerative disc disease, a mood disorder with a depressed mood, and a history of alcohol and cannabis dependence.  Tr. 18.  At Step Three, the ALJ found that Sheboy did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404,

Subpt. P, App. 1.[4] Tr. 14. The ALJ then determined Sheboy's RFC and found that she could perform a limited range of light work:

> She can lift and/or carry 20 pounds occasionally and 10 pounds frequently. She can perform all postural activities at least occasionally, but should not climb ladders, ropes, and scaffolds. The claimant has difficulty with reading small print and should not be required to perform work that requires fine or excellent visual acuity. She should avoid all work hazards, such as dangerous machinery and unprotected heights. The claimant should avoid jobs that require more than superficial interaction with others.

Tr. 21. At Step Four, the ALJ found that Sheboy could not perform her past relevant work. Tr. 24. Finally, at Step Five, after considering her vocational factors, RFC, and the evidence from the VE, the ALJ found that Sheboy was capable of performing work that existed in significant numbers in the national economy. Tr. 24-25. Thus, the ALJ concluded that Sheboy was not disabled. Tr. 25-26.

## V. Arguments of the Parties

Sheboy argues that the ALJ's Residual Functional Capacity ("RFC") determination is not supported by substantial evidence because the ALJ failed to properly consider the opinion her treating physician. In response, the Commissioner argues that substantial evidence supports the ALJ's RFC finding and that the ALJ properly evaluated the medical source opinions.

## VI. Law & Analysis

**A.     Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321

---

[4] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.     Substantial Evidence Supports the ALJ's Residual Functional Capacity Determination and the Weight Given to the Medical Source Opinions**

Sheboy argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to give controlling weight to the opinion of her treating psychiatrist, Dr. Drahotusky-Dodig.[5]  Doc. 13, p. 12. Contrary to this argument, the ALJ properly evaluated the opinion of Dr. Drahotusky-Dodig under the treating physician rule and provided an adequate basis for assigning the opinion less than controlling weight.

Under the treating physician rule, the opinion of a treating source is entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If the opinion of a treating source is not accorded controlling

---

[5] Sheboy's arguments focus solely on her mental impairments and the ALJ's failure to consider the opinion of her treating psychiatrist. She does not challenge the ALJ's findings with regard to her physical impairments.

weight, an ALJ must consider certain factors in determining what weight to give the opinion, such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d).

If an ALJ assigns less than controlling weight to a treating source's opinion, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. However, the ALJ is not obliged to explain the weight afforded to each and every factor that might pertain to the medical source opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x. 802, 804 (6th Cir. 2011); *Allen v. Commissioner of Social Security*, 561 F.3d 646, 651 (6th Cir. 2009) (even a "brief" ALJ statement identifying such factors will be found adequate to articulate "good reasons" to discount a treating physician's opinion).

In her March 1, 2011, opinion, Dr. Drahotusky-Dodig opined that Sheboy's mental impairments would preclude her from meeting the competitive standards in the following four work-related categories: (1) maintain attention for two hour segments; (2) perform at a consistent pace without an unreasonable number and length of rest periods; (3) accept instruction and respond appropriately to supervisors; and (4) get along with coworkers or peers without unduly distracting them or exhibiting behavior extremes. Tr. 773-74. She also opined that Sheboy could be absent about four days per month. Tr. 775.

The ALJ evaluated Dr. Drahotusky-Dodig's opinion, as well as the record as a whole, and reasonably assigned limited weight to this opinion. Tr. 23-24. The ALJ explained that she

gave only limited weight to Dr. Drahotusky-Dodig's opinion because Dr. Drahotusky-Dodig did not adequately consider Sheboy's activities of daily living, ongoing work activity, or persistent substance use. Tr. 24. In support of this determination, the ALJ discussed the inconsistencies between Dr. Drahotusky-Dodig's opinions and her treatment notes. Tr. 23. For example, the ALJ noted that, in December 2009, Dr. Drahotusky-Dodig found that Sheboy's condition was stable. Tr. 23. Similarly, the ALJ noted that, in September 2010, Dr. Drahotusky-Dodig stated that Sheboy's symptoms improved significantly when she was fully compliant with her medications. Tr. 23. The ALJ also noted that Dr. Drahotusky-Dodig's opinion that Sheboy would have difficulty tolerating additional stress and poorly controlled pain was inconsistent with the GAF score of 51-60 that she assigned to Sheboy, which indicated only moderate limitations. Tr. 23.

The ALJ also found that Dr. Drahotusky-Dodig's opinion was entitled to less than controlling weight because Dr. Drahotusky-Dodig did not adequately take into account Sheboy's ongoing substance use and how it affected her mental state, i.e., that Sheboy consumed wine daily with meals, although it did not interact well with her medication, and that she used marijuana on a weekly basis. Tr. 23. Furthermore, the ALJ found that Sheboy's testimony at the administrative hearing refuted some of the limitations found by Dr. Drahotusky-Dodig. Tr. 23. Finally, the ALJ explained that Dr. Drahotusky-Dodig's opinion as to the seriousness of Sheboy's limitations was inconsistent with Sheboy's daily activities, such as driving, caring for her personal needs, caring for her six pets, exercising, walking her dogs and her neighbors' dogs, performing household chores, shopping, gardening, and taking daily swims in her backyard pool. The ALJ's discussion demonstrates that she properly discounted Dr. Drahotusky-Dodig's opinion under the regulatory factors of supportability and consistency. Thus, the ALJ provided

good reasons for discounting the opinion of Dr. Drahotusky-Dodig and complied with agency regulations.  *See, e.g., Allen v. Comm'r of Soc. Sec*., 561 F.3d 646, 651 (6th Cir. 2009) (finding that an ALJ provided good reasons for discounting treating physician opinion where the ALJ's stated reason was brief but reached several of the factors an ALJ must consider when determining what weight to give non-controlling opinion).

  A review of the record reveals that the reasons provided by the ALJ for discounting Dr. Drahotusky-Dodig's opinion are supported by substantial evidence.  Counseling and therapy records from MetroHealth and from Dr. Drahotusky-Dodig repeatedly show that Sheboy was stable, that she was alert and oriented, that she had logical and goal directed thought, that she had fair insight and judgment, and that she had sustained concentration and attention.  Tr. 19-24, 312-314, 319-321, 325-330, 331-333, 338-340, 344-349, 380-381, 457-458, 459-461, 469-470, 471-473, 479-481, 488-490, 492-496, 497-499, 503-506, 509-515, 607-608, 621-623, 656-657, 688-690, 716-717, 726-728, 743-746, 761-763.  In addition, Dr. Drahotusky-Dodig noted that Sheboy's medication was working and that her symptoms improved when she was compliant with her medication.  Tr. 719-721, 743-746.  Treatment notes also show that Sheboy's diminished vision caused her to have some difficulty with her activities (Tr. 380-381, 457-458, 469-470, 656-657, 679-680), but as her vision returned to baseline, her mood improved and she became more functional.  Tr. 743-746.  And, in July 2010, Dr. Drahotusky-Dodig noted that Sheboy was coping better with stress and her physical limitations.  Tr. 745.  This evidence shows that Sheboy was not as limited as found by Dr. Drahotusky-Dodig.

  Moreover, state agency psychologist, Dr. Karen Steiger, reviewed Sheboy's medical records and found that her mental impairments did not rise to a disability level.  Tr.  277-290.  Significantly, agency regulations provide that state agency reviewing sources are highly skilled

medical professionals who are experts in social security issues.  *See* 20 C.F.R. § 416.927.  Dr. Steiger noted that Sheboy had sustained concentration and attention, logical and organized thought processes, and normal recent and remote memory.  Tr. 289.  She also opined that Sheboy did not have any significant limitations due to her mental impairments.  Tr. 277-90.  This evidence supports the ALJ's determination to give less than controlling weight to Dr. Drahotusky-Dodig's opinion.

In sum, the ALJ applied the correct legal standard and provided good reasons for assigning less than controlling weight to the opinion of Dr. Drahotusky-Dodig.  Substantial evidence supports this determination.  Accordingly, the ALJ did not violate the treating physician rule.

In addition to her general treating physician argument, Sheboy specifically asserts that the ALJ erred by failing to account for the restrictions on concentration, persistence, and pace found by Dr. Drahotusky-Dodig in the RFC determination.  Doc. 13, pp. 5-6; Doc. 17, p. 1.  This argument is without merit.  In her decision, the ALJ gave limited weight to the opinion provided by Dr. Drahotusky-Dodig.  In making this determination, she did not simply reject Dr. Drahotusky-Dodig's opinion as to whether Sheboy was disabled.  Rather, the ALJ rejected all of the mental restrictions that Dr. Drahotusky-Dodig believed applied to Sheboy.  As discussed above, the ALJ articulated an adequate basis for assigning less than controlling weight to the opinion of Dr. Drahotusky-Dodig.  Thus, the ALJ did not err in failing to account for the restrictions on concentration, persistence, and pace found by Dr. Drahotusky-Dodig in her RFC determination.

## VII. Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Louise M. Sheboy's applications for DIB and SSI should be **AFFIRMED**.

Dated: September 11, 2012

Kathleen B. Burke
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).